JAMES Y. MOORE, TRADING AND DOING BUSINESS AS MOORE'S DINETTE, AND GRACYE MOORE, PLAINTIFFS-APPELLANTS v. CITY OF CREEDMOOR, RALPH D. SEAGROVES, INDIVIDUALLY AND AS CHIEF OF POLICE OF THE CITY OF CREEDMOOR, AND VANCE DOUGLAS HIGH, INDIVIDUALLY AND AS A COMMISSIONER OF THE CITY OF CREEDMOOR, DEFENDANTS-APPELLEES

No. 939SC1073

(Filed 5 September 1995)

**1. Malicious Prosecution § 4 (NCI4th)— malicious prosecution claim based on civil nuisance action—action "initiated" by defendants**

Notwithstanding that the prior proceeding herein was a civil nuisance action, evidence considered in the light most favorable to plaintiffs tending to show defendants "initiated" or "instituted, procured or participated in" that action would suffice, for purposes of surviving summary judgment, to present the first element of a malicious prosecution claim.

**Am Jur 2d, Malicious Prosecution §§ 7, 10.**

**2. Malicious Prosecution § 17 (NCI4th)— nuisance abatement action—initiation by police chief—sufficiency of evidence**

The evidence was sufficient to raise a genuine issue of material fact regarding whether defendant police chief "initiated" or "instituted, procured, or participated in" an earlier nuisance abatement action upon which this malicious prosecution action was based where it tended to show that, at a meeting of the City Board of Commissioners, defendant suggested that plaintiffs' dinette be declared a public nuisance and permanently closed; in support of his proposal, defendant submitted a collection of police reports concerning the dinette and its patrons which officers had compiled over the years at his direction; after the Board passed a resolution requesting the district attorney to undertake a nuisance abatement action, defendant himself took that docu-

ment and the list of incidents from the police log to the district attorney; and defendant characterized himself as "the motivating force" behind the nuisance action.

**Am Jur 2d, Malicious Prosecution §§ 139, 140, 150, 184.**

3. **Malicious Prosecution § 17 (NCI4th)— nuisance abatement action—initiation by defendants—sufficiency of evidence**

The evidence was sufficient to raise a genuine issue of material fact regarding whether defendant city initiated an earlier nuisance abatement action upon which this malicious prosecution action was based where it tended to show that the Board of Commissioners frequently discussed closing plaintiffs' dinette; the Board member who served as Police Commissioner often met in conference with the police chief and spoke about the "problem" the dinette was creating in the community; the Board discussed specific methods of closing the dinette on numerous occasions; when presented with the police chief's recommendation, the Board voted to adopt the resolution and directed the chief to confer with the district attorney about the matter; and at all times the chief acted as the agent and employee of the police department and acted within the course and scope of his agency.

**Am Jur 2d, Malicious Prosecution §§ 139, 140, 150, 184.**

4. **Malicious Prosecution § 17 (NCI4th)— nuisance abatement action—initiation by defendant city commissioner—insufficiency of evidence**

The evidence was insufficient to raise a genuine issue of material fact regarding whether defendant city commissioner initiated an earlier nuisance abatement action upon which this malicious prosecution action was based where defendant was no longer a commissioner and thus neither voted on nor was involved in the passage of the resolution requesting the district attorney to institute the nuisance abatement action.

**Am Jur 2d, Malicious Prosecution §§ 139, 184.**

5. **Malicious Prosecution § 19 (NCI4th)— evidence of presence and absence of probable cause for underlying action—summary judgment improper**

Since the evidence before the trial court reflected both the presence and absence of probable cause for the bringing of a pub-

lic nuisance abatement action by defendants, the trial court in a malicious prosecution action erred in entering summary judgment in favor of defendants.

**Am Jur 2d, Malicious Prosecution §§ 159, 169, 184.**

6. **Malicious Prosecution § 19 (NCI4th)— absence of probable cause—sufficiency of evidence of malice**

Since the evidence raised a justiciable issue of fact as to whether defendants initiated a nuisance abatement action without probable cause, and based upon the inference of implied malice arising from evidence of the absence of probable cause, plaintiffs presented sufficient factual evidence to support an award of compensatory damages and to withstand defendants' motion for summary judgment in the malicious prosecution action.

**Am Jur 2d, Malicious Prosecution §§ 152, 169, 184.**

7. **Malicious Prosecution § 21 (NCI4th)— action based on prior civil proceeding—sufficiency of evidence of special damages**

The evidence was sufficient to forecast the sort of special damages necessary when a malicious prosecution action is based upon a prior civil proceeding where the uncontroverted evidence showed that plaintiffs' disco-dancing business was enjoined from operation for seven months pending trial.

**Am Jur 2d, Malicious Prosecution § 10.**

8. **Municipal Corporations §§ 444, 446 (NCI4th)— claim against city—no governmental immunity—claim against police chief—no governmental immunity—issue as to whether conduct corrupt of malicious**

Plaintiffs' malicious prosecution claim against defendant city was not barred by governmental immunity where the city had purchased liability insurance; nor was their claim against defendant police chief barred in his official capacity, as public officers share in the immunity of their governing municipality, or in his individual capacity, as the evidence raised an issue of material fact as to whether his conduct was corrupt or malicious.

**Am Jur 2d, Municipal, County, School, and State Tort Liability §§ 37, 38.**

Liability or indemnity insurance carried by governmental unit as affecting immunity from tort liability. **68 ALR2d 1437.**

**9. Intentional Infliction of Mental Distress § 2 (NCI4th)— intentional infliction of emotional distress—insufficiency of evidence of outrageous conduct**

The trial court did not err in allowing the motion for summary judgment by defendant city and defendant police chief with respect to plaintiffs' intentional infliction of emotional distress claim where plaintiffs' evidence that defendants "manufactured" complaints about plaintiffs' business, sought and obtained an injunction for the abatement of a nuisance, and shut plaintiffs' dance and disco business down for seven months did not raise a question of fact as to whether defendants' conduct was "extreme and outrageous," nor was there evidence that defendants intended for plaintiffs to suffer severe emotional distress.

**Am Jur 2d, Fright, Shock, and Mental Disturbance §§ 4, 5.**

**Modern status of intentional infliction of mental distress as independent tort; "outrage". 38 ALR4th 998.**

**10. Constitutional Law § 86 (NCI4th)— monetary damages for alleged violations of constitutional rights—no relief against city or city employees in official capacities**

Because plaintiffs sought monetary damages for alleged violation of their constitutional rights, they were not entitled to relief under 42 U.S.C. § 1983 against a city or the individual defendants in their official capacities, as the city and the individual defendants were not "persons."

**Am Jur 2d, Civil Rights § 4.**

**Supreme Court's views as to who is "person" under civil rights statute (42 USCS sec. 1983) providing private right of action for violation of federal rights. 105 L. Ed. 2d 721.**

**11. Constitutional Law § 115 (NCI4th)— violation of constitutional rights by city employees—matter of public concern outweighed by governmental interest**

The trial court properly granted summary judgment for the defendant police commissioner and defendant police chief in

**MOORE v. CITY OF CREEDMOOR**

[120 N.C. App. 27 (1995)]

their individual capacities on plaintiffs' claims that defendants violated their First Amendment right to free speech and to petition the government for redress of grievances, since there was no showing that plaintiff's complaints about the police department's handling of his calls for assistance pertained to a matter of public concern which outweighed the governmental interest in efficient operations.

**Am Jur 2d, Consitutional Law §§ 496, 501, 510.**

**12. Constitutional Law § 86 (NCI4th)— alleged racial discrimination—summary judgment for defendants proper**

Summary judgment was properly granted for defendant police commissioner and defendant police chief in their individual capacities on plaintiffs' claim that their Fourteenth Amendment right to equal protection was violated by defendants' conspiracy to discriminate against them on the basis of race and defendants' selective enforcement of a no parking ordinance.

**Am Jur 2d, Civil Rights § 3; Constitutional Law §§ 735, 738.**

Judge GREENE concurring in part and dissenting in part.

Appeal by plaintiffs from summary judgment entered 25 May 1993 by Judge B. Craig Ellis in Granville County Superior Court. Heard in the Court of Appeals 26 May 1994.

*Glenn, Mills & Fisher, P.A., by Stewart W. Fisher, for plaintiffs-appellants.*

*McDaniel & Anderson, by William E. Anderson, for defendants-appellees.*

JOHN, Judge.

Plaintiffs James and Gracye Moore (plaintiffs or the Moores) appeal the trial court's grant of summary judgment in favor of defendants the City of Creedmoor (the City), Police Chief Ralph D. Seagroves (Seagroves or the Chief) and former City Commissioner Vance Douglas High (High or Commissioner High). As discussed herein, we find plaintiffs' assignments of error regarding their claim of malicious prosecution in the main persuasive, but conclude the remainder cannot be sustained.

Pertinent facts and procedural information include the following: Since 1947, plaintiff James Y. Moore (Moore) has operated a diner known as Moore's Dinette (the Dinette) in a building located on Lyon Street in Creedmoor, North Carolina. His wife, plaintiff Gracye Moore (Mrs. Moore), is the Dinette's bookkeeper and cook. During the week, the Dinette functions primarily as an eating establishment patronized predominantly by the black community of Creedmoor. On weekend nights (Friday through Sunday), however, disco-dancing is offered inside the Dinette between the hours of 10:00 p.m. and 1:30 a.m. All applicable ABC licenses for the sale of beer are properly maintained.

The City of Creedmoor is governed by a Board of Commissioners (the Board) composed of five Commissioners and headed by the Mayor. The Commission votes on City ordinances and resolutions which, once enacted, represent the official policy of the City. Defendant High was a member of the Board from December 1977 through December 1989, and served as "Police Commissioner" for a significant portion of that time. Since 17 May 1983, defendant Ralph D. Seagroves has occupied the position of Police Chief. The City's Police Chief attends all Commission meetings and reports directly to the Board.

On 4 November 1982, Moore petitioned the Board to rezone an area adjacent to the Dinette in order to construct a parking lot. Although the local Planning Agency approved the request and recommended it be allowed, the matter ultimately was "tabled" by the Board of Commissioners and thus effectively denied.

On 29 December 1982, Moore telephoned for police assistance in quelling a disturbance involving two female customers of the Dinette. However, the two responding officers allegedly merely watched the women fight in the street. Moore subsequently filed an official written grievance, resulting in the reprimand of both officers and suspension of one.

Although the grievance was filed several months before Chief Seagroves assumed his duties, he testified in deposition that he believed the officers should not have been reprimanded. Within a year after his job commenced, Seagroves targeted the Dinette as a "problem area" because of "the traffic . . . and the street problem . . . , the fights that you have down there." During the winter of 1983-1984, he hired Vermadine Clark (Clark), a black female officer from nearby Oxford, to conduct undercover surveillance activities. Clark was instructed by the Chief to collect evidence regarding illegal alcohol

and drug sales at the Dinette. However, despite substantial effort on her part, Clark found no evidence of illegal activity taking place at the Dinette; moreover, it was her opinion that the Moores would not tolerate unlawful behavior of any kind in their establishment. It is undisputed that until sometime in 1991, the Moores were unaware Clark had visited the Dinette in the capacity of undercover officer.

In February 1986, a .38 Special handgun was stolen from the Dinette during a break-in. Following his initial report of the incident, Moore spoke repeatedly with Seagroves and other officers about the status of his weapon. Although the Creedmoor Police Department (the Department) received notification in or around September 1987 that the gun was recovered in Jacksonville, North Carolina, it was subsequently destroyed by Jacksonville authorities. Because he had persistently sought information about the status of the weapon, Moore attributed this destruction to the willful failure of the Department to seek return of the handgun and to the Department's desire to leave his business defenseless.

In June 1988, a fire was deliberately started at the Dinette and the letters "KKK" painted on the dumpster. Although Moore immediately called the Department, he perceived its response to be intentionally slow. When he conveyed this to Seagroves and demanded an investigation, the Chief replied he already knew the fire had not been started by the Ku Klux Klan. The arson case was never resolved.

Following this series of events, Seagroves instructed his officers to begin making written reports regarding any time spent responding to calls at the Dinette. During late 1988 and early 1989, also upon the Chief's instructions, police began ticketing automobiles of Dinette patrons for parking violations along Lyon Street.

At a 24 January 1989 appearance before the Board, Seagroves recommended that the City outlaw all parking along Lyon Street. Commissioner High moved for adoption of the ordinance, which passed without notice to the Moores. In their complaint, plaintiffs allege the ordinance was not enforced on week nights nor during daytime hours, but that when the Dinette opened for disco-dancing on the weekends, officers appeared and immediately began ticketing and towing automobiles of Dinette patrons.

On 28 March 1989, Moore formally complained at a Board meeting concerning conduct of the Department. Specifically, he contested the Department's alleged (1) negligent or deliberate failure to return

his stolen gun; (2) intentionally slow response to his calls and the failure on a particular occasion to arrest an unruly customer; (3) selective enforcement of the no-parking ordinance against Dinette customers; and (4) enforcement of the public parking ordinance on a privately-owned vacant lot adjacent to the Dinette. High and Seagroves both were in attendance at this meeting.

Following Moore's complaint to the Board, City officers continued their practice of recording each incident involving Dinette patrons. In July 1990, two events occurred which, according to Seagroves, "finalized" his decision to request that the District Attorney commence procedures to close the Dinette.

In the first, a driver backed his automobile into a parking lot on Main Street where Seagroves was seated in his patrol car, causing a collision with the Chief's vehicle. In the second, labelled a "mob scene" or "riot" by defendants, two men began fighting in a parking lot behind a drug store on Main Street, a crowd gathered to watch, and shots allegedly were fired into the air. It is undisputed, however, that although these two incidents occurred in an area near the Dinette, they were never directly linked to the Moores, the Dinette or any of its patrons.

On 24 July 1990, Seagroves appeared before the Board and recommended it seek to have the Dinette proclaimed a public nuisance and shut down. The Chief submitted a collection of police reports allegedly generated since 1988 as a result of activities at the Dinette or the conduct of its patrons. He also revealed in deposition testimony that he and the Board had previously discussed the "problem" of the Dinette on numerous occasions.

After hearing from Seagroves, the Board passed a Resolution on 24 July 1990 requesting the local District Attorney to institute a nuisance abatement action against the Moores pursuant to N.C. Gen. Stat. § 19-1 (1983 & Cum. Supp. 1994) and N.C. Gen. Stat. § 19-2.1 (1983). High was no longer a Commissioner on the date the Resolution issued and was not involved in its passage.

Seagroves personally delivered the Resolution to the District Attorney who on 1 August 1990 filed a nuisance abatement action against the Moores in Granville County Superior Court. The complaint was verified by Seagroves. On that same date, the Superior Court issued a temporary restraining order enjoining the Moores from operating the Dinette in any capacity and ordering Seagroves to pad-

lock the premises. Following a hearing, the court entered a prelimi-
nary injunction on 10 August 1990 prohibiting operation of the busi-
ness between the hours of 9:00 p.m. and 7:00 a.m.

The nuisance abatement trial commenced 20 March 1991, and on
26 March 1991 the jury returned a verdict finding the Moores' opera-
tion of the Dinette did not constitute a public nuisance. Judgment was
entered upon the verdict 11 April 1991, dissolving the preliminary
injunction and awarding the Moores attorney fees in the amount of
$14,000.00, plus additional costs totalling $578.40.

On 24 January 1992, plaintiffs filed the instant action against the
City, Seagroves (individually and in his official capacity as Police
Chief), and High (individually and in his official capacity as City
Commissioner). In their complaint, plaintiffs alleged, *inter alia*, the
following separate claims for relief with respect to each named
defendant: malicious prosecution; intentional infliction of emotional
distress; and violation of federal constitutional rights secured by the
First, Fifth and Fourteenth Amendments to the United States
Constitution. Both compensatory and punitive damages were sought
from each defendant.

Defendants answered denying liability. Citing occurrences subse-
quent to conclusion of the nuisance action, Seagroves separately
counterclaimed alleging a new public nuisance action.

On 2 December 1992, plaintiffs moved for summary judgment on
Seagroves' counterclaim; on 11 January 1993, defendants likewise
filed a motion for summary judgment as to all counts contained in
plaintiffs' complaint. Following a hearing, the trial court granted both
motions. Only plaintiffs appeal.

I. State Claims

A. Malicious Prosecution

Plaintiffs first contend the trial court erred by allowing summary
judgment on their claim of malicious prosecution. We believe this
contention has merit in regards to Seagroves and the City.

Summary judgment is a procedural device designed to allow pen-
etration of an unfounded claim or defense before trial by exposing a
fatal weakness therein. *Patrick v. Hurdle*, 16 N.C. App. 28, 37, 190
S.E.2d 871, 877 (citation omitted), *disc. review denied*, 282 N.C. 304,
192 S.E.2d 195 (1972). It is properly granted only when the "pleadings,
depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *See* N.C.R. Civ. P. 56(c) (1990).

The party moving for summary judgment bears the burden of establishing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Normile v. Miller and Segal v. Miller,* 63 N.C. App. 689, 692, 306 S.E.2d 147, 149 (1983) (citations omitted), *modified on other grounds and aff'd,* 313 N.C. 98, 326 S.E.2d 11 (1985). A movant may meet its burden by showing either that: (1) an essential element of the non-movant's case is nonexistent; or (2) based upon discovery, the non-movant cannot produce evidence to support an essential element of its claim; or (3) the movant cannot surmount an affirmative defense which would bar the claim. *Watts v. Cumberland County Hosp. System,* 75 N.C. App. 1, 6, 330 S.E.2d 242, 247 (1985) (citation omitted), *rev'd in part on other grounds,* 317 N.C. 321, 345 S.E.2d 201 (1986).

In addition, because summary judgment is a drastic remedy, *Anderson v. Canipe,* 69 N.C. App. 534, 537, 317 S.E.2d 44, 47 (1984) (citation omitted), the record is to be viewed in the light most favorable to the non-movant, giving it the benefit of all inferences which reasonably may be drawn therefrom. *Whitley v. Cubberly,* 24 N.C. App. 204, 206-07, 210 S.E.2d 289, 291 (1974) (citations omitted).

Malicious prosecution based upon a prior *civil* proceeding (such as a public nuisance action, *see* G.S. § 19-2.1) consists of four elements:

(1) . . . initiat[ion by the defendant of] the [prior] proceedings, (2) . . . [with] malic[e] and without probable cause, (3) . . . terminat[ion of those proceedings] in plaintiff's favor, and (4) . . . special damages beyond the ordinary expense and inconvenience of litigation.

*Abram v. Charter Medical Corp. of Raleigh,* 100 N.C. App. 718, 722, 398 S.E.2d 331, 333-34 (1990) (citation omitted), *disc. review denied,* 328 N.C. 328, 402 S.E.2d 828 (1991); *see also Stanback v. Stanback,* 297 N.C. 181, 202-03, 254 S.E.2d 611, 625 (1979) (citations omitted).

The public nuisance action (the prior proceeding) indisputably was resolved in favor of the Moores. However, defendants maintain plaintiffs' malicious prosecution claim was fatally deficient because the evidence raised no question of fact (1.) regarding "initiation" of that action by any of the named defendants (2.) maliciously *or* with-

out probable cause, or (3.) regarding whether plaintiffs incurred any resultant "special damages."

We discuss each of these elements separately.

1.

Plaintiffs contend the evidence, viewed in the most favorable light, indicates defendants "instituted, procured or participated in" the public nuisance action. *See Williams v. Kuppenheimer Manufacturing Co.*, 105 N.C. App. 198, 200, 412 S.E.2d 897, 899 (1992) (citation omitted).

Defendants counter, however, that the contours of the first element of a malicious prosecution claim based upon an earlier *civil* proceeding differ from one grounded upon a prior *criminal* proceeding. More particularly, they argue a plaintiff in circumstances such as those *sub judice* "must show . . . that defendant *initiated* [in the sense of *actually filed*] the prior civil proceeding . . . ." *Stanback*, 297 N.C. at 203, 254 S.E.2d at 625 (emphasis added) (citations omitted). In other words, plaintiffs' malicious prosecution claim cannot be based upon defendants' "procuring" the prior civil proceeding, or "causing" it to be brought by someone other than the named defendants, such as the District Attorney. Defendants cite language in *Hawkins v. Webster*, 78 N.C. App. 589, 337 S.E.2d 682 (1985), as follows:

> there is no allegation that defendants . . . ever initiated a prior action against [plaintiff]; rather, [plaintiff] alleges that defendants "procured or caused to be instituted against [him]" the third party indemnity actions filed by the Bank. This does not, in our estimation, satisfy the requirement that the defendant *initiate* a prior proceeding.

*Hawkins*, 78 N.C. App. at 593, 337 S.E.2d at 685 (third alteration in original) (emphasis added) (Court was examining the propriety of trial court's *Rule 12(b)(6)* dismissal of plaintiff's malicious prosecution claim.).

Defendants rely upon the District Attorney's affidavit submitted to the trial court asserting that "in [his] opinion, after a review of the police reports and available information, [he] was satisfied that probable cause existed for the filing of such a nuisance abatement action and the seeking of injunctive relief." It is not disputed that based upon this conclusion, the District Attorney filed the complaint against plaintiffs on behalf of the State of North Carolina. Therefore, defend-

ants argue, although the matter was initially brought to the prosecutor's attention by Seagroves and the Board, the ultimate decision to file (i.e., "initiate") the action was made solely by the District Attorney in the exercise of his discretion. Accordingly, defendants continue, neither the City, Seagroves, nor High can be held responsible for having "initiated" the prior nuisance proceeding.

We do not interpret the "initiation" requirement as narrowly as defendants, nor do we read either *Stanback* or *Hawkins* as creating a rule of law that whenever a malicious prosecution claim is based upon a prior civil (as opposed to criminal) proceeding, a plaintiff must put forth evidence that the defendant initiated, in the sense of *actually filed*, the earlier action.

We first note that Webster's defines "to initiate" as "to begin or set going: make a beginning of: perform or facilitate the first actions, steps, or stages of . . . ." Webster's Third New International Dictionary 1164 (1966). Black's Law Dictionary ascribes the following meaning to the term: "Commence, start; originate; introduce . . . . To propose for approval . . . ." Black's Law Dictionary 705 (5th ed. 1979).

Moreover, when discussing the tort of malicious prosecution generally, our cases indicate a liberal reading of the requirement that the defendant have "initiated" the earlier proceeding. For example, while some of our decisions involving a claim based upon a prior criminal action have stated a plaintiff must prove the defendant *initiated* the prior criminal proceeding, *see, e.g., Alt v. Parker*, 112 N.C. App. 307, 312, 435 S.E.2d 773, 776 (1993), *disc. review denied*, 335 N.C. 766, 442 S.E.2d 507 (1994), and others have said a plaintiff must show defendant *instituted* the prior proceeding, *see, e.g., Juarez-Martinez v. Deans*, 108 N.C. App. 486, 491, 424 S.E.2d 154, 157, *disc. review denied*, 333 N.C. 539, 429 S.E.2d 558 (1993), still others have held a plaintiff must establish that the defendant "instituted, procured *or participated in* the criminal proceeding against plaintiff." *Williams*, 105 N.C. App. at 200, 412 S.E.2d at 899 (citation omitted) (emphasis added).

Additional decisions indicate this Court evaluates the "initiate" or "institute, procure or participate in" element of malicious prosecution claims based upon prior civil or criminal actions in the same manner. *See U v. Duke University*, 91 N.C. App. 171, 177, 371 S.E.2d 701, 706 ("To recover for malicious prosecution *based on all types of actions*, the plaintiff must show that the defendant *initiated* the earlier pro-

ceeding . . . .") (emphasis added) (citation omitted), *disc. review denied*, 323 N.C. 629, 374 S.E.2d 590 (1988).

[1] We hold that, notwithstanding that the prior proceeding herein was a civil nuisance action, evidence considered in the light most favorable to plaintiffs tending to show defendants "initiated" *or* "instituted, procured or participated in" that action would suffice, for purposes of surviving summary judgment, to present the first element of a malicious prosecution claim. Accordingly, we examine the evidence as to each defendant.

### Chief Seagroves

[2] It was uncontroverted below that at a Board meeting held 24 July 1990, Seagroves suggested the Dinette be declared a public nuisance and permanently closed. In support of his proposal, Seagroves submitted a collection of police reports concerning the Dinette and its patrons which officers had compiled over the years at his direction. After the Board passed a resolution requesting the District Attorney to undertake a nuisance abatement action, Seagroves himself took that document and the list of "Incidents involving Moore's [Dinette] or Moore's Patrons from the Creedmoor Police Log" to the District Attorney. The Chief thus single-handedly provided both the Board and the District Attorney with the information upon which their respective determinations ultimately were based. Moreover, in deposition testimony, Seagroves characterized himself as "the motivating force" behind the nuisance action. He also verified the complaint against plaintiffs, attesting that all information contained therein was "true to the best of his knowledge . . . ."

We believe consideration of the foregoing in the light most favorable to plaintiffs, *Whitley*, 24 N.C. App. at 206-07, 210 S.E.2d at 291 (citations omitted), raises a genuine issue of material fact regarding whether Seagroves "initiated" (or "instituted, procured or participated in") the nuisance abatement action. In this regard, the following language from the *Williams* case is instructive:

> [D]efendant contends it did not institute, procure or participate in the prior . . . proceeding, rather it merely provided assistance and information to the prosecuting authorities. The act of giving honest assistance and information to prosecuting authorities does not render one liable for malicious prosecution. *However, in the present case, the jury could find defendant's actions went further than merely providing assistance and information.*

*Defendant brought all the documents used in the prosecution to the police. . . . Except for the efforts of defendant, it is unlikely there would-have been a criminal prosecution of plaintiff.* Under these circumstances, the trial court was correct in determining this was a factual matter for the jury.

*Williams*, 105 N.C. App. at 200-01, 412 S.E.2d at 900 (emphasis added) (citations omitted).

Similarly, in the case *sub judice*, "[e]xcept for the efforts of" Seagroves, it is unlikely the Board would have adopted the nuisance resolution nor would the District Attorney have filed the nuisance abatement action against plaintiffs. A jury could thus reasonably find that the Chief "beg[a]n or set going: ma[d]e a beginning of: perform[ed] or facilitate[d] the first actions, steps, or stages of" the public nuisance action. *See* Webster's at 1164.

### The City

**[3]**  The deposition testimony of Seagroves and High indicated that the Board frequently discussed closing plaintiffs' Dinette. For example, while serving as Police Commissioner for the Board, High often met in conference with Seagroves and spoke about the "problem" the Dinette was creating in the Creedmoor community. Further, both men acknowledged the Board discussed specific methods of closing the Dinette on numerous occasions during High's tenure as a Commissioner, including on one occasion asking the town attorney about the plausibility of using the nuisance laws against plaintiffs. Moreover, when presented with Seagroves' 24 July 1990 recommendation, the Board voted to adopt the resolution and directed the Chief to confer with the District Attorney about the matter.

Finally, plaintiff alleged, and the evidence at a minimum tended to show that, at all relevant times, "Seagroves acted as the agent and employee of the Police Department of the City of Creedmoor and acted within the course and scope of his agency." In that event, the City would be vicariously liable for the actions of Seagroves, *see, e.g.*, *Phillips v. Winston-Salem/Forsyth County Bd. of Educ.*, 117 N.C. App. 274, 279, 450 S.E.2d 753, 757 (1994), *disc. review denied*, 340 N.C. 115, 456 S.E.2d 318 (1995), which we have previously determined to be sufficient for purposes of summary judgment on the first element of a claim of malicious prosecution.

Construed in the light most favorable to plaintiffs, therefore, *Whitley*, 24 N.C. App. at 206-07, 210 S.E.2d at 291 (citations omitted),

the evidence adequately raised an issue of fact as to whether defendant City (i.e., the Board) "initiated" the public nuisance action.

### Commissioner High

**[4]** With respect to defendant High, however, we believe the evidentiary showing was insufficient.

It is undisputed that High served on the Board from December 1977 through December 1989. As he was thus no longer a Commissioner in January 1990, High neither voted on the resolution nor was he involved in its passage. Even though High may have voiced his disapproval of the Dinette at earlier Board meetings, such expressions of opinion do not as a matter of law constitute evidence of "initiation" of (or "institut[ion] [of], procure[ment] [of] or participat[ion] in") the public nuisance action. *See Williams*, 105 N.C. App. at 200, 412 S.E.2d at 899 (citation omitted).

As evidence in support of an essential element of plaintiffs' malicious prosecution action against High was nonexistent, the trial court properly entered summary judgment in his favor as to that particular claim. *See, e.g., Messick v. Catawba County*, 110 N.C. App. 707, 712, 431 S.E.2d 489, 493, *disc. review denied*, 334 N.C. 621, 435 S.E.2d 336 (1993).

2.

**[5]** We next consider the second element of a claim for malicious prosecution—i.e., that defendants initiated the public nuisance proceeding "maliciously and without probable cause."

### (a.) Probable Cause

In a malicious prosecution action, "probable cause 'has been properly defined as the existence of such facts and circumstances, known to [defendants] at the time, as would induce a reasonable man to commence a prosecution.' " *Pitts v. Pizza, Inc.*, 296 N.C. 81, 87, 249 S.E.2d 375, 379 (1978) (quoting *Morgan v. Stewart*, 144 N.C. 424, 430, 57 S.E. 149, 151 (1907)); *see also Allison v. Food Lion, Inc.*, 84 N.C. App. 251, 254, 352 S.E.2d 256, 257 (1987) (test for determining absence of probable cause is "whether a [person] of ordinary prudence and intelligence under the circumstances would have known that the charge had no reasonable foundation") (citation omitted).

Defendants contend probable cause was evidenced by the allegations contained in the nuisance action, including the list of incidents compiled by the Department, which defendants maintain sets out

MOORE v. CITY OF CREEDMOOR

[120 N.C. App. 27 (1995)]

dozens of events constituting "breaches of the peace." *See* G.S. § 19-1. In addition, defendants point to the trial court's issuance of a preliminary injunction and its denial of plaintiffs' dismissal motion at the nuisance trial.

However, plaintiffs' evidence indicated that many of the listed incidents involved neither the Dinette nor its patrons. Moreover, neither of the two occurrences which Seagroves stated "finalized" his decision to seek action from the Board, that is, the wreck of Seagroves' patrol car and the parking lot "riot" near Main Street, were shown by any evidence to be linked to the Moores or the Dinette. Therefore, because the factual matters upon which defendants relied to establish "probable cause" are disputed, the existence of probable cause is properly a question for the jury. *Flippo v. Hayes*, 98 N.C. App. 115, 118, 389 S.E.2d 613, 615 (citation omitted), *aff'd*, 327 N.C. 490, 397 S.E.2d 512 (1990).

Further, when evidence is presented showing both the existence and the absence of probable cause, a malicious prosecution action should proceed to trial. *Williams*, 105 N.C. App. at 202, 412 S.E.2d at 901; *see also, e.g., Jones v. Gwynne*, 312 N.C. 393, 403, 323 S.E.2d 9, 18 (1984). Thus, where *prima facie* evidence of the existence and the absence of probable cause respectively is produced, the issue should be left to determination by the jury and not ruled upon as a matter of law. *Id.*; *see also Messick*, 110 N.C. App. at 716, 431 S.E.2d at 495 ("[B]ased on the facts illustrated by [officers'] testimony, probable cause did exist to arrest [plaintiff]. *Because the plaintiff has presented no forecast of evidence to the contrary*, summary judgment on the malicious prosecution claim was proper.") (emphasis added).

In the case *sub judice*, both direct and circumstantial evidence was presented tending to show a lack of probable cause for the institution of the public nuisance proceedings. In addition to the disputed evidence mentioned above, for example, Seagroves in deposition testimony specifically admitted he had no reason to believe the Moores themselves ever created a nuisance. Further, in uncontradicted affidavits, several individuals residing on Lyon Street indicated they were not disturbed by operation of the Dinette, and that the Moores were "decent law-abiding citizens who work very hard to conduct a business where people can meet, socialize, eat, dance and assemble on weekends." Undercover officer Clark pointedly asserted that neither plaintiff tolerated illegal activity or breaches of the peace in the Dinette or on its premises. Similarly, by way of petition, some fifty-

seven citizens from Creedmoor and surrounding communities stated "Moore operates [the] Dinette in a manner that is peaceful, safe, lawful. He does not permit . . . anyone else to conduct acts which create and constitute breaches of the peace." Indeed, it appears the jury deliberated a mere ten minutes before rejecting the public nuisance claims against plaintiffs.

Accordingly, as evidence before the trial court reflected both the presence and absence of probable cause for the bringing of a public nuisance action against defendants Seagroves and the City, we agree with plaintiffs that the trial court erred in entering summary judgment in favor of those defendants insofar as this portion of the malicious prosecution claim is concerned.

### (b.) Malice

[6] In the trial court, defendants proffered certain affidavits tending to show the public nuisance action against plaintiffs was commenced with probable cause and not maliciously. Citing *Middleton v. Myers*, 299 N.C. 42, 45, 261 S.E.2d 108, 110 (1980), defendants assert that once they submitted such evidence negating the element of malice, plaintiffs were "required to come forward with [their] own affidavits or evidence setting forth *specific facts* as to the maliciousness of defendant[s'] prosecution." *Id.* We do not disagree with defendants' general statement of law. However, the circumstances *sub judice* mandate a result different from that reached in *Middleton*.

In an action for malicious prosecution, the malice element may be satisfied by a showing of either *actual* or *implied (legal)* malice. *See, e.g., Best v. Duke University*, 112 N.C. App. 548, 552, 436 S.E.2d 395, 399 (1993) (citation omitted), *aff'd in part, rev'd in part on other grounds*, 337 N.C. 742, 448 S.E.2d 506, *reh'g denied*, 338 N.C. 525, 452 S.E.2d 807 (1994); *see also Alt*, 112 N.C. App. at 312, 435 S.E.2d at 776 (citation omitted). "Actual malice . . . is defined as 'ill-will, spite, or desire for revenge, or under circumstances of insult, rudeness or oppression, or in a manner evidencing a reckless and wanton disregard of [plaintiff's] rights.' " *Williams*, 105 N.C. App. at 202-03, 412 S.E.2d at 901 (alteration in original) (quoting *Williams v. Boylan-Pearce, Inc.*, 69 N.C. App. 315, 319, 317 S.E.2d 17, 20 (1984), *aff'd per curiam*, 313 N.C. 321, 327 S.E.2d 870 (1985)). Actual malice, which "is more difficult to substantiate . . . is only required if plaintiff is seeking punitive damages." *Id.* at 202-03, 412 S.E.2d at 901 (citation omitted).

Implied (or legal) malice, on the other hand, "may be inferred from want of probable cause in reckless disregard of plaintiff[s'] rights." *Pitts*, 296 N.C. at 86-87, 249 S.E.2d at 379 (citations omitted); *see also Williams*, 105 N.C. App. at 203, 412 S.E.2d at 901 ("legal malice may be inferred from a lack of probable cause") (citations omitted).

Our determination above that the evidence (detailed *supra*) raised a justiciable issue of fact as to whether defendants initiated the nuisance abatement action without probable cause resolves the implied malice question as well. *Id.* Based upon the inference of implied malice arising from evidence of the absence of probable cause, plaintiffs presented sufficient factual evidence to support an award of compensatory damages and to withstand defendants' motion for summary judgment.

As there was no showing of actual malice, however, plaintiffs' claim for punitive damages based upon their malicious prosecution action must fail. *See Williams*, 105 N.C. App. at 203, 412 S.E.2d at 901 ("[A] showing of actual malice is only required if plaintiff is seeking punitive damages . . . [;] [l]egal malice suffices to support an award of compensatory damages for malicious prosecution.") (citations omitted).

Notwithstanding, plaintiffs contend that because the evidence construed in their favor demonstrates the public nuisance action was commenced in "retaliation for the exercise of [the Moores'] First Amendment rights and/or corruption within the municipal government and/or racial prejudice," they have presented sufficient evidence of actual malice. As discussed further *infra* at section II, however, we are not persuaded by this argument.

3.

[7] Defendants also maintain the evidence failed to forecast the sort of special damages necessary when a malicious prosecution action is based upon a prior civil proceeding. We disagree.

Our Supreme Court has explained:

The gist of such special damage is a substantial interference either with the plaintiff's person or his property such as . . . causing an injunction to issue prohibiting plaintiff's use of his property in a certain way.

*Stanback,* 297 N.C. at 203, 254 S.E.2d at 625 (citations omitted); *see also Abram,* 100 N.C. at 722, 398 S.E.2d at 333-34 ("[A] claim of malicious prosecution requires proof . . . that there are special damages beyond the ordinary expense and inconvenience of litigation.") (citation omitted); *see also Finance Corp. v. Lane,* 221 N.C. 189, 196, 19 S.E.2d 849, 853 (1942) ("[A] suit for malicious prosecution will lie where the plaintiff's property or business has been interfered with by . . . the granting of an injunction . . . .") (quotation omitted).

Defendants respond that because "[i]n the unique facts of a nuisance abatement case, a restraining order is inherent as the means by which the plaintiff would prevail if it won. . . . Being enjoined from operating the alleged nuisance is . . . not a special damage as contemplated for the malicious prosecution tort." *See* G.S. § 19-1. In addition, defendants argue that a malicious prosecution action cannot be grounded upon "[e]mbarrassment, expense, inconvenience, lost time from work or pleasure, stress, strain and worry [such as] are experienced by all litigants, to one degree or another . . . ." *Brown v. Averette,* 68 N.C. App. 67, 70, 313 S.E.2d 865, 867 (1984).

We believe the uncontroverted evidence that the Moores' discodancing business was enjoined from operation for seven months pending trial adequately establishes "a substantial interference with . . . plaintiff[s'] . . . property," *Stanback,* 297 N.C. at 203, 254 S.E.2d at 625 (citations omitted), sufficient to withstand defendants' motion for summary judgment. Indeed, at the hearing in the trial court, counsel for defendants conceded that "because of the injunction . . . there is probably enough to get [them] into the door to talk about some special damages."

### Immunities

[8] In the event we were to determine, as we have, that plaintiffs' action for malicious prosecution survives the foregoing summary judgment hurdles, defendants Seagroves and the City argue the claim is nonetheless barred by virtue of certain immunities. In other words, they maintain plaintiffs cannot surmount an applicable affirmative defense. *See, e.g., Taylor v. Ashburn,* 112 N.C. App. 604, 606-07, 436 S.E.2d 276, 278 (1993) (citation omitted), *disc. review denied,* 336 N.C. 77, 445 S.E.2d 46 (1994).

### a. The City

"Under the doctrine of governmental immunity, a municipality is not liable for the torts of its officers and employees if the torts are

committed [in the performance of] a governmental function." *Id.* at 607, 436 S.E.2d at 278 (citations omitted); *see also Wiggins v. City of Monroe*, 73 N.C. App. 44, 49, 326 S.E.2d 39, 43 (1985) (citations omitted). Our cases have long held that "[a] police officer in the performance of his duties is engaged in a governmental function." *Mullins v. Friend*, 116 N.C. App. 676, 680, 449 S.E.2d 227, 230 (1994) (citation omitted). When enacting resolutions and ordinances, a City's Board of Commissioners and the officers of which it is composed are likewise engaged in a governmental function. Accordingly, the City would ordinarily not be liable for the torts (such as malicious prosecution) of Seagroves or the Board. *See, e.g., Davis v. Messer*, 119 N.C. App. 44, 52, 457 S.E.2d 902, 907 (1995).

However, a municipality may waive governmental immunity by the purchase of liability insurance, *see Gregory v. City of Kings Mountain*, 117 N.C. App. 99, 103, 450 S.E.2d 349, 353 (1994) (citations omitted); but "[i]mmunity is waived only to the extent that the city or town is indemnified by the insurance contract from liability for the acts alleged." *Combs v. Town of Belhaven*, 106 N.C. App. 71, 73, 415 S.E.2d 91, 92 (1992) (citations omitted); *see also* N.C. Gen. Stat. § 160A-485 (1994).

In the case *sub judice*, plaintiffs presented uncontroverted evidence establishing that the City purchased liability insurance covering the malicious prosecution claim, and defendants concede as much in their appellate brief. The City, therefore, has waived any defense of governmental immunity with respect to this cause of action to the extent plaintiff's damages do not exceed the amount of coverage. *See, e.g., Mullins*, 116 N.C. App. at 681, 449 S.E.2d at 230 (citation omitted).

### b. Chief Seagroves

Seagroves was sued in both his official and his individual capacities. Since public officers, such as policemen, share in the immunity of their governing municipality, they are generally "immune from suit for torts committed while . . . performing a governmental function." *Id.* at 680, 449 S.E.2d at 230 (citation omitted); *Taylor*, 112 N.C. App. at 607, 436 S.E.2d at 278 (citations omitted). This is because "[a]n action brought against individual officers in their official capacities is an action against the municipality." *Gregory*, 117 N.C. App. at 102, 450 S.E.2d at 352-53 (citation omitted). However, where, as here, the City has waived its sovereign immunity with the purchase of liability insurance, public officers such as Seagroves are likewise not entitled

to raise governmental immunity as a defense to liability, at least as to the amount of coverage purchased. *See Mullins*, 116 N.C. App. at 680-81, 449 S.E.2d at 230.

As to the claim against Seagroves in his individual capacity, it is uncontroverted that a public official sued individually is "shielded from liability" unless his conduct was " 'corrupt or malicious,' " or he " 'acted outside of and beyond the scope of his duties.' " *See, e.g, Wiggins*, 73 N.C. App. at 49, 326 S.E.2d at 43 (quoting *Smith v. Hefner*, 235 N.C. 1, 7, 68 S.E.2d 783, 787 (1952)).

Moreover, our courts have repeatedly observed that "an action in tort for malicious prosecution is based upon a defendant's *malice* in causing process to issue." *Middleton*, 299 N.C. at 44, 261 S.E.2d at 109 (emphasis added). As we have determined, the forecast of evidence regarding plaintiffs' malicious prosecution claim against Seagroves to be sufficient to withstand summary judgment, we also hold the evidence raised an issue of material fact as to whether his conduct was "corrupt or malicious." Seagroves' affirmative defense notwithstanding, summary judgment was improperly entered in his favor.

In sum, we hold the trial court erred by granting summary judgment in favor of the City and Seagroves as to plaintiffs' malicious prosecution cause of action for compensatory damages only. However, summary judgment as to those defendants for punitive damages and as to defendant High on this claim is affirmed.

### B. Intentional Infliction of Emotional Distress

[9] Plaintiffs next argue the trial court erred by allowing each defendant's motion for summary judgment with respect to plaintiffs' intentional infliction of emotional distress claim. This argument cannot be sustained.

The elements of a claim for intentional infliction of emotional distress are that the defendant "(1) engaged in extreme and outrageous conduct, (2) which was intended to cause and did cause (3) severe emotional distress." *Bryant v. Thalhimer Brothers, Inc.*, 113 N.C. App. 1, 6-7, 437 S.E.2d 519, 522 (1993) (citation omitted), *disc. review denied, appeal dismissed*, 336 N.C. 71, 445 S.E.2d 29 (1994). Assuming *arguendo* sufficient evidence supported the third element, evidentiary infirmities with respect to the remaining elements nonetheless rendered summary judgment appropriate.

In particular, as this Court stated recently:

> To.meet the essential element of extreme and outrageous con-
> duct, the conduct must go beyond all possible bounds of decency,
> and "be regarded as atrocious, and utterly intolerable in a civi-
> lized community. The liability clearly does not extend to mere
> insults, indignities, threats . . . ."

*Wagoner v. Elkin City Schools' Bd. of Education*, 113 N.C. App. 579,
586, 440 S.E.2d 119, 123 (quoting *Daniel v. Carolina Sunrock Corp.*,
110 N.C. App. 376, 383, 430 S.E.2d 306, 310, *rev'd in part*, 335 N.C.
233, 436 S.E.2d 835 (1993)), *disc. review denied*, 336 N.C. 615, 447
S.E.2d 414 (1994). Further, plaintiffs must set forth "specific inci-
dents" of conduct, *see Bryant*, 113 N.C. App. at 7, 437 S.E.2d at 523
(citation omitted), which "go beyond all possible bounds of decency,"
and are such as could be considered " 'atrocious, and utterly intoler-
able.' " *Wagoner*, 113 N.C. App. at 586, 440 S.E.2d at 123 (quotation
omitted).

Suffice it to observe that we do not believe the record discloses
any evidence which raises a question of fact as to whether defend-
ants' conduct was "extreme and outrageous." Nor is there evidence
indicating that by their conduct defendants *intended* for plaintiffs to
suffer severe emotional distress. Accordingly, the trial court properly
entered summary judgment as to all defendants on plaintiffs' cause of
action for intentional infliction of emotional distress.

## II. FEDERAL CONSTITUTUIONAL CLAIMS

[10] Plaintiffs next contend summary judgment was improperly
granted ,as to their claims for violations of the United States
Constitution. More particularly, plaintiffs assert their First
Amendment rights to free speech and to petition the government for
redress of grievances as well as their Fourteenth Amendment rights
to equal protection and to substantive due process were violated by
defendants' conduct. We are not persuaded by plaintiffs' arguments
relative to this assignment of error.

"Section 1983 affords the claimant a civil remedy for a depriva-
tion of federally protected rights by persons acting under the.color of
state law." *Majebe v. N.C. Bd. of Medical Examiners*, 106 N.C. App.
253, 259, 416 S.E.2d 404, 407, *disc. review denied, appeal dismissed*,
332 N.C. 484, 421 S.E.2d 355 (1992). *See* 42 U.S.C. § 1983. However, as
"[t]he text of section 1983 permits actions only against a 'person,' "
*Corum v. University of North Carolina*, 330 N.C. 761, 771, 413 S.E.2d
276, 282 (citation omitted), *reh'g denied*, 331 N.C. 558, 418 S.E.2d 664,

MOORE v. CITY OF CREEDMOOR

[120 N.C. App. 27 (1995)]

*cert. denied,* 121 L. Ed. 2d 431, 61 U.S.L.W. 3287, 61 U.S.L.W. 3369, 61 U.S.L.W. 3370 (1992), our cases have held that:

> when an action is brought under section 1983 in state court against the State, its agencies, and/or its officials acting in their official capacities, neither a State nor its officials acting in their official capacity are "persons" under section 1983 when the remedy sought is monetary damages.

*Id.* at 771, 413 S.E.2d at 282-83 (citation omitted); *see also Lenzer v. Flaherty,* 106 N.C. App. 496, 513, 418 S.E.2d 276, 287 (citation omitted), *disc. review denied,* 332 N.C. 345, 421 S.E.2d 348 (1992). Because plaintiffs in the case *sub judice* seek monetary damages for alleged violation of their constitutional rights, they are not entitled to relief under section 1983 against the City, or against Seagroves and High in their *official* capacities, *Corum,* 330 N.C. at 771, 413 S.E.2d at 283; *see also Messick,* 110 N.C. App. at 713-14, 431 S.E.2d at 493 (citations omitted), and summary judgment was proper as to those claims.

However, as public officials, Seagroves and High "will be *personally* answerable for damages under section 1983 . . . where qualified immunity is not available to shield [them] from liability for deprivation of federal rights." *Lenzer,* 106 N.C. App. at 506, 418 S.E.2d at 282-83 (emphasis added) (citation omitted).

As discussed below, we find the evidentiary forecast insufficient with respect to plaintiffs' federal constitutional claims brought against defendants Seagroves and High in their individual capacities. It is therefore unnecessary to address the issue of qualified immunity. *See, e.g., Messick,* 110 N.C. App. at 717, 431 S.E.2d at 495.

A.

[11] Concerning the alleged violation of their First Amendment right to free speech and to petition the government for redress of grievances, plaintiffs' primary contention is that defendants' efforts to close the Dinette originated in retaliation for Moore's complaints against the Department. In this context, plaintiffs correctly observe that a citizen's right to criticize government includes the right to criticize police officials in the performance of their duties. *See, e.g., Hague v. C.I.O.,* 307 U.S. 496, 513, 83 L. Ed. 1423, 1435 (1939), and that decisions by public officials made in retaliation for the exercise of such constitutionally protected rights are actionable under § 1983. *Madewell v. Roberts,* 909 F.2d 1203, 1206 (8th Cir. 1990) (citations omitted).

However, as this Court has stated:

> To maintain [a] claim [for violation of federal free speech rights] under section 1983, [a] plaintiff must first establish that the conduct was protected by showing that (i) the speech pertained to a matter of public concern and (ii) the public concern outweighed the governmental interest in efficient operations.

*Lenzer,* 106 N.C. App. at 506-07, 418 S.E.2d at 283 (citation omitted). Assuming *arguendo* that Moore's complaints about the Department's handling of his calls for assistance "pertained to a matter of *public* concern," *id.* (emphasis added), we nevertheless hold summary judgment was proper as to this claim because there was no evidentiary showing, nor do plaintiffs argue the point in their brief, that this "public concern" outweighed "the governmental interest in efficient operations."

We observe at this juncture that a municipality and its officers have a "duty to keep the public streets . . . open for travel and free from unnecessary obstructions." *See* N.C. Gen. Stat. § 160A-296(a)(2) (1994). Further, a city is authorized to enact ordinances which "define, prohibit, regulate, or abate acts, omissions, or conditions, detrimental to the health, safety, or welfare of its citizens and the peace and dignity of the city, and may define and abate nuisances." *See* N.C. Gen. Stat. § 160A-174(a) (1994); *see also Grace Baptist Church v. City of Oxford,* 320 N.C. 439, 442-43, 358 S.E.2d 372, 374 (1987). Similarly, the officers of a municipality, such as Seagroves and High, are entitled to take reasonable actions incident to enforcement of the city's proclamations.

### B.

[12] As to the Fourteenth Amendment right to equal protection under the law, plaintiffs contend defendants conspired to discriminate against them on the basis of race and selectively enforced the no-parking ordinance enacted by the Board in 1989. We are not persuaded by plaintiffs' arguments relative to this assignment of error.

To support the proposition of impermissible racial discrimination, plaintiffs are able to point only to the circumstance that the Dinette is owned, operated and primarily frequented by members of the black race, coupled with the assertion that Seagroves, High and the Board conspired to close it, and the bald, unsupported suggestion that Seagroves and High were motivated by racist leanings or tenden-

cies. The evidence is wholly inadequate on the claim of racial discrimination.

Regarding their argument that the no-parking ordinance was selectively enforced, plaintiffs refer to evidence that while vehicles of Dinette patrons were routinely ticketed or towed if left along Lyon Street during the Dinette's weekend operating hours, automobiles were regularly parked along Lyon Street on weekday nights and Sunday mornings during church without being ticketed or towed.

However, our courts have frequently pointed out that "selective enforcement of a law is not itself a constitutional violation . . . ." *State v. Davis*, 96 N.C. App. 545, 550, 386 S.E.2d 743, 745 (1989) (citation omitted); rather, a plaintiff must present evidence that the defendant was motivated by "an invidious purpose" in selectively enforcing the particular law. *Id.* Stated otherwise, plaintiffs must have been:

> singled out for prosecution while others similarly situated and committing the same acts [were] not . . . [*and*] the discriminatory selection for [enforcement must have been] invidious and done in bad faith in that it rest[ed] upon such impermissible considerations as race, religion or the desire to prevent [their] exercise of constitutional rights.

*Majebe*, 106 N.C. App. at 260-61, 416 S.E.2d at 408 (emphasis added) (quoting *State v. Howard*, 78 N.C. App. 262, 266-67, 337 S.E.2d 598, 601-02 (1985), *disc. review denied, appeal dismissed*, 316 N.C. 198, 341 S.E.2d 581 (1986)); *see also Grace*, 320 N.C. at 445, 358 S.E.2d at 376 ("The party who alleges selective enforcement of an ordinance has the burden of showing that the ordinance has been administered 'with an evil eye and an unequal hand.' ") (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74, 30 L. Ed. 220, 227 (1886)).

Defendants relied in the trial court upon Seagroves' deposition testimony as indicating a legitimate purpose for the enactment of the no-parking ordinance on Lyon Street and for the manner in which it was enforced. In particular, defendants presented substantial and uncontroverted evidence to the effect that Lyon Street was obstructed only during hours the Dinette offered disco-dancing, and further that the Department had received citizen complaints about parking, noise and frightening crowds only during those same late night, early morning weekend hours.

No evidence countered the foregoing so as to indicate an "invidious purpose" on the part of defendants in their enforcement of the no-

parking ordinance. Absent evidence of a discriminatory purpose or effect, no material issue of fact was raised concerning violation of plaintiffs' rights to equal protection under the law, *see Oyler v. Boles,* 368 U.S. 448, 456, 7 L. Ed. 2d 446, 453 (1962) (conscious exercise of some selectivity in enforcement is not necessarily a federal constitutional violation); *see also Grace,* 320 N.C. at 445, 358 S.E.2d at 376 ("Mere laxity in enforcement does not satisfy the elements of a claim of selective or discriminatory enforcement in violation of the equal protection clause.") (citation omitted), and summary judgment against them on this claim was proper.

In view of the foregoing holding, we decline to address plaintiffs' related contention that because the public nuisance action was instituted with the intent to deprive them of equal protection under the law, their malicious prosecution claim was also cognizable under § 1983.

## C.

Finally, although plaintiffs allege their constitutional right to substantive due process was violated by defendants' conduct, no evidence of record establishes on any defendant's part the sort of abuses of governmental authority amounting to "conduct which shocks the conscience" necessary to sustain plaintiffs' claim of a due process violation. *See Rochin v. California,* 342 U.S. 165, 172, 96 L. Ed. 183, 190 (1952); *see also Hall v. Tawney,* 621 F.2d 607, 613 (4th Cir. 1980) (In order to be litigable, substantive due process claims must relate to action which "amount[s] to a brutal and inhumane abuse of official power literally shocking to the conscience.").

Based on the foregoing, we hold there was no error in the trial court's entry of summary judgment on plaintiffs' federal constitutional claims in favor of the City as well as Seagroves and High in both their official and individual capacities.

CONCLUSION

For the reasons discussed hereinabove, the trial court erred by granting summary judgment in favor of defendants Seagroves and the City on plaintiffs' state tort claim of malicious prosecution. Upon remand, however, plaintiffs are entitled to pursue only compensatory damages against those defendants. The court properly entered summary judgment in favor of all defendants on plaintiffs' remaining claims.

**MOORE v. CITY OF CREEDMOOR**

[120 N.C. App. 27 (1995)]

Affirmed in part; reversed and remanded in part.

Chief Judge ARNOLD concurs.

Judge GREENE concurring in part and dissenting in part.

Judge GREENE concurring in part and dissenting in part.

I believe the trial court correctly entered summary judgment for all defendants on each of the claims asserted by the plaintiffs. I therefore disagree with the majority that the trial court erred in granting summary judgment for defendants Seagroves and the City on the malicious prosecution claim.

The majority concludes that the nuisance abatement action filed by the district attorney on 1 August 1990 was in fact "initiated" by the City and Seagroves. I disagree. The civil abatement action, which is the basis of the present malicious prosecution action, was filed pursuant to N.C. Gen. Stat. § 19-2.1 and the plaintiff in that action was "The State of North Carolina on relation of David R. Waters, District Attorney." Although the abatement action is required to be filed in the name of the State, "the Attorney General, district attorney, or any private citizen of the county," N.C.G.S. § 19-2.1 (1983), can "become relators and prosecute the cause in the name of the State." *Dare County v. Mater*, 235 N.C. 179, 180-81, 69 S.E.2d 244, 245 (1952). Instead of becoming a relator in the case, Seagroves on behalf of the City presented the information to the district attorney who reviewed the material and "was satisfied that probable cause existed for the filing of . . . a nuisance abatement action" and filed and signed the complaint seeking the injunction. The abatement action was thus "initiated" by the district attorney and the fact that the City supplied the information to the district attorney is not dispositive. *See Hawkins v. Webster*, 78 N.C. App. 589, 593, 337 S.E.2d 682, 685 (1985) (action of defendants in procuring earlier civil action filed by third party did not constitute "initiation" within meaning of malicious prosecution).